MARC TOBEROFF (188547)
mtoberoff@toberoffandassociates.com
DARRELL R. ATKINSON (280564)
datkinson@toberoffandassociates.com
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333

*Attorneys for Plaintiff and Counterclaim Defendant*
*Hill and Third-Party Counterclaim Defendant Lady Amos*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| R. LANCE HILL, an individual,<br><br>Plaintiff,<br><br>v.<br><br>METRO-GOLDWYN-MAYER STUDIOS INC., a Delaware corporation, AMAZON STUDIOS LLC, a California limited liability company, UNITED ARTISTS PICTURES INC., a Delaware corporation, and DOES 1-10,<br><br>Defendants. | Case No. 2:24-cv-01587-HDV-SSC<br><br>Assigned: Hon. Hernan D. Vera<br><br>**DISCOVERY MATTER**<br><br>**JOINT L.R. 37-2 STIPULATION RE PLAINTIFF AND THIRD-PARTY COUNTERCLAIM DEFENDANT'S MOTION TO COMPEL PRODUCTION BY DEFENDANTS OF DOCUMENTS RESPONSIVE TO REQUESTS FOR PRODUCTION NO. 42**<br><br>Judge: Hon. Stephanie S. Christensen<br>Date: May 21, 2026<br>Time: 10:00 a.m.<br>Place: Courtroom 790<br>Complaint Filed: February 27, 2024<br>Fact Disc. Cut-Off: May 27, 2026<br>Expert Disc. Cut-off: July 1, 2026 |

Pre-Trial Conf.: October 27, 2026
Trial Date: November 17, 2026

METRO-GOLDWYN-MAYER
STUDIOS INC., a Delaware
corporation; AMAZON STUDIOS
LLC, a California limited liability
company; UNITED ARTISTS
PICTURES INC., a Delaware
corporation,

    Counterclaimants,

  v.

R. LANCE HILL, an individual; and
LADY AMOS LITERARY WORKS
LTD., a Canadian corporation,

    Counterclaim
    Defendant and Third-
    Party Counterclaim
    Defendant.

## TABLE OF CONTENTS

I. Introductory Statement …………………………………………………..6

    A. Plaintiff's Statement ……………………………………………..6

    B. Studio Parties' Statement ………………………………………...8

II. Plaintiff's Specification of the Issue ……………………………………..10

III. Plaintiff's Contention ……………………………………...………..12

    A. Procedural Background …………………………………………...12

    B. Relevancy ………………………………………………………16

        i. The Discovery is Relevant to All Four Claims ………………...16

        ii. Defendants' Acquisition Agreements Are Not Equal …………19

        iii. There Are Two Relevant Time Periods ………………...……….22

    C. Burden and Proportionality …………………………………… 22

IV. Studio Parties' Position …………………………………………………24

    A. The Cherry-Picked Set of Non-Party Agreements the Hill Parties Seek Would Bear No Relevance to Any Claims or Issues in this Action ……………………………………………….24

    B. The Hill Parties Offer No Justification for the Disproportionate Burden They Seek to Impose ………………………….26

# **TABLE OF AUTHORTIES**

**Cases:**

*Andreoli v. Youngevity Int'l, Inc.*,
   No. 3:16-cv-2922-BTM-JLB, 2021 WL 4933395
   (S.D. Cal. Mar. 22, 2021) …………………………………………….27

*Carbajal v. HSBC Bank U.S.A., N.A.*,
   No. CV 16-9297 PSG FFM, 2017 WL 7806587
   (C.D. Cal. Sept. 1, 2017) …………………………………………..26

*Classic Media, Inc. v. Mewborn*,
   532 F.3d 978 (9th Cir. 2008) ………………………………………..19, 22

*Copeland Corp. v. Choice Fabricators, Inc.*,
   No. 3:04CV398, 2007 WL 9717680 (S.D. Ohio Apr. 6, 2007) … ……..21

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
   716 F.3d 302 (2d Cir. 2013) …………………………………………18

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2nd Cir. 2002) …………………………………………...18

*Ray Charles Foundation v. Robinson*,
   919 F. Supp. 2d 1054 (C.D. Cal. 2013) ………………………………18

*Shaw v. Experian Info. Solutions, Inc.*,
   306 F.R.D. 293 (S.D. Cal. 2015)…………………………………………...22

*Siert v. Spiffy Franchising, LLC*,
   758 F. Supp. 3d 1142 (N.D. Cal. 2024) ………………………………27

*Vanguard Logistics v. Robinson*,
   No. CV 20-9880 JAK (PVCx), 2024 WL 1171654
   (C.D. Cal. Mar. 6, 2024)……………………………………………22

**Statutes / Rules:**

17 U.S.C. § 203……………………………………………..…17, 18, 19, 20

- 4 -

17 U.S.C. § 304 …………………………………………………………………………..19

Fed. R. Civ. P. 26…………………………………………………………………….22

## I. INTRODUCTORY STATEMENT.

### A. Plaintiff's Statement.

Plaintiff R. Lance Hill ("Hill"), joined by Third-Party Counterclaim Defendant Lady Amos Literary Works, Ltd. ("Lady Amos") (collectively "Plaintiff"), seek to compel Defendants Metro-Goldwyn-Mayer Studios Inc. ("MGM"), Amazon Studios LLC, and United Artists Pictures Inc. ("UA") (collectively "Defendants") to produce a sample set of purchase agreements.

Hill wrote a screenplay titled "Roadhouse" (the "Screenplay"). After he finished it, he and his loan out, Lady Amos, in 1986, entered into a "Literary Purchase Agreement" ("LPA") with UA. *See* Atkinson Dec., Ex. 4 (LPA). At the same time, a "Writer Employment Agreement – Loanout" ("Rewrite Agreement") was entered into. *See* Atkinson Dec., Ex. 4 (LPA), ¶ 1; *see also* Ex. 5 (Rewrite Agreement). Pursuant to the LPA, UA acquired rights to the Screenplay. *See* Atkinson Dec., Ex. 4 (LPA), Preamble; *id*., Assignment, Preamble-¶ 1. In 1989, UA/MGM released the film classic, "Road House." In November 2021, Hill availed himself of his statutory right to terminate Defendants' rights in the Screenplay (effective in November 2023). In 2024, Defendants released their Roadhouse remake (the "2024 Remake").

In this action, Hill alleges that he validly terminated Defendants' rights and that the 2024 Remake infringes his reacquired rights. Defendants allege that Hill defrauded the Copyright Office in 2024 when he registered the Screenplay. Alternatively, Defendants contend that Plaintiff breach a work-made-for-hire representation in the LPA. The issue of whether Hill wrote the Screenplay for himself or for Lady Amos is central to the Parties' claims and defenses. If the Screenplay was a Lady Amos work-made-for-hire, Defendants say that Hill could not terminate their rights.

This motion involves documents that are relevant to the Parties' central not a / a work-made-for-hire charges. Plaintiff contends that other Defendant agreements similar in kind to the LPA from 1976 to 1987 are highly relevant. For example, these agreements could evidence that the LPA's work-made-for-hire clause is a rote post-creation clause designed by Defendants to nullify a writer's statutory termination right by retroactively recharacterizing the purchased screenplay as a work-made-for-hire at the time of purchase. If the LPA's work-made-for-hire clause is such a recasting it is unenforceable. *See* § III.B.i below. Defendants dispute relevancy; on relevancy, this Court tentatively sided with Plaintiff.

As to burden, the Parties presented competing proposals for searching for a sample set of 20 agreements. On this issue, the Court tentatively sided with Defendants; thus, the Court's tentative was to deny this motion.

While Plaintiff appreciates that the Court has spent time on this dispute and is familiar with the issues, Plaintiff nevertheless here describes the dispute's history, *see* § III.A, stresses Plaintiff's relevancy points, *see* § III.B, and addresses burden and proportionality, *see* § III.C, in detail, owing to the importance of the sought discovery to Plaintiff. As the history recap reveals, **the dispute boils down to two issues**: (1) the benefit of Plaintiff obtaining agreements from both the periods **1976-1977** *and* **1978-1987** and the lack of undue burden this poses for Defendants; and (2) the benefit that the relevant samples be, as in this case, agreements involving a **screenwriter's loan out entity** for the purchase of **pre-existing screenplays** and the lack of undue burden this poses to Defendants.

**On the first issue**—the time period covered—the balance tips in Plaintiff's favor. The termination statute at issue took effect in 1978, and a marked increase in work-made-for-hire clauses in Defendants' agreements after

- 7 -

1977, compared to before, would be significant evidence in support of Plaintiff's allegation that the LPA's work-made-for-hire clause is part of a Defendant ploy to recharacterize purchased screenplays as "works-made-for-hire." That probative value outweighs the incremental burden of sampling both periods rather than one.

On the second issue—the type of agreement sampled—the scale also weighs in Plaintiff's favor. A search across all acquisition agreements would sweep in materials of little to no relevance, imposing burden without commensurate benefit. For example, a writing services agreement to write a commissioned screenplay based on a work Defendants already owned has no bearing whatsoever on this case or the issue of the studio's improper recharacterization of a "spec" screenplay as work-made-for-hire after it has been created independent of the studio. Limiting the sample to acquisitions of pre-existing screenplays involving a studio, a writer, and the writer's loan out entity—the structure of the LPA—targets the agreements most probative of Plaintiff's claims and defenses and reduces, rather than expands, the burden on Defendants.

Defendants should be compelled to produce the highly relevant sample agreements sought by Plaintiff.

### B. Studio Parties' Statement.

This motion is the latest iteration of the ever-shifting sands by which the Hill Parties continue to deform their own RFP to impose ongoing, immense and needless burden on the Studio Parties for a collection of documents that have no relevance to the issues in this action. In an effort to prove their fanciful theory that UA (and the studio industry at large) forced writers like Hill to use loan-out companies when selling literary properties, the Hill Parties propounded original RFP No. 42 to seek "[d]ocuments sufficient to show the standard and/or usual

- 8 -

terms used by You in Agreements Concerning the acquisition of literary material from authors and/or their loan out companies from January 1, 1978 to December 31, 1987." No documents exist reflecting any "standard" or "usual" set of terms. But in an effort to moot the parties' dispute, the Studio Parties agreed to produce a random sample of 20 literary acquisition agreements (at the Hill Parties' request, 10 for released films and 10 on undeveloped projects) for the time period identified in the request—a task requiring the Studio Parties to search through scores of project files to find those containing (i) acquisition agreements[1] (ii) falling within the requested time period.

Unsatisfied, the Hill Parties have pivoted to demanding acquisition agreements that are *not* a set of "representative agreements" between 1978-1987 as they originally demanded (*see* Dkt. No. 63-1 at 9-11 (Dispute No. 8)), but instead a decidedly *non*-"representative" set of agreements meeting exacting criteria designed precisely to support their theory (ostensibly), and over an ever-expanding timeframe. This motion should be denied.

*First*, the non-representative set of agreements the Hill Parties now demand would do nothing to show any custom or practice by UA in acquiring literary properties, and would thus be irrelevant even to the Hill Parties' strained theory. By contrast, the random sample of acquisition agreements following the January 1, 1978 effective date of the Copyright Act that the Studio Parties have proposed to search for and produce, by contrast, would suffice to reveal whether any "standard and/or usual" terms and practices were employed during the same period, and under the same statutory regime, in which the 1986 LPA here was entered into.

---

[1] Not all film projects begin with an "acquisition agreement" like the 1986 LPA, for example, where a film concept originates with the studio itself and not from a preexisting literary property created by another.

*Second*, the Hill Parties' proposal would vastly magnify the Studio Parties' burden by requiring the Studio Parties to search through an untold number of project files to locate acquisition agreements meeting the Hill Parties' strict criteria found nowhere in the Hill Parties' own RFPs. The Hill Parties' complaint that "[a] search across all acquisition agreements would sweep in materials of little to no relevance" like "a writing services agreement to write a commissioned screenplay" (*see supra*) misses the point entirely, as a writing services agreement is not an acquisition agreement for the simple reason that no property is being "acquired." The Studio Parties' proposal is to produce only acquisition agreements like the literary purchase agreement at issue in this case.

*Third*, the Hill Parties offer no basis to impose this enormous burden. To the contrary, the documents produced in discovery show that the Hill Parties' theory that the 1986 LPA was a contract of "adhesion" (*see* Dkt. No. 63-1 at 9-11 (Dispute No. 8)) is not only fanciful, but conclusively refuted. Among other things, CAA's production includes drafts of the 1986 LPA in which CAA commented on various provisions of that agreement in the course of back-and-forth negotiations, and acknowledged and accepted the very representation and warranty the Hill Parties now claim was a term of adhesion. The Hill Parties' claim that they were either snookered or forced into accepting this provision is false, and provides no basis to impose any further burden on the Studio Parties beyond producing the random sample of acquisition agreements the Hill Parties initially demanded.

## II.    PLAINTIFF'S SPECIFICATION OF THE ISSUE.

Plaintiff seeks a sample set of Defendants' agreements for the purchase of pre-existing screenplays where the agreement included the screenwriter's loan out entity as a counterparty and the agreement is from the period 1976 to 1987. Plaintiff moves to compel the production of these sample agreements.

- 10 -

JT. DISC. STIP. RE PL. MTC RE RFP NO. 42

Defendants resist production on relevancy and burden grounds and proposed to search for documents subject to a set of conditions.  Plaintiff proposed that different criteria be used.  The Court's April 22 IDC tentative was in favor of Defendants.  The original request, original response, and the proposal's discussed at the April 22 IDC are below:

- RFP No. 42: "Documents sufficient to show the standard and/or usual terms used by You in Agreements Concerning the acquisition of literary material from authors and/or their loan out companies from January 1, 1978 to December 31, 1987."  Atkinson Dec., Ex. 6 (Pl. Set One RFPs). [2, 3]

- RFP No. 42 Response: "[Defendants] object[] to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, not proportional to the needs of the case, and seeks documents irrelevant to the claims and defenses in this action.  The phrase 'standard and/or usual terms' is vague and ambiguous, and presumes that any such terms existed over a decade-long period.  [Defendants] further object[] to this Request insofar as it seeks documents protected by the attorney-client privilege, work-product protection or other applicable legal protections or privileges."  Atkinson Dec., Ex. 7 (MGM's Set 1 RFP Responses).

- Defendants' Last IDC Compromise: "As to exemplary agreements, the Studio Parties have proposed to produce a random sample consisting of 20 acquisition agreements falling within the time period from 1978-1987—10

---

[2] "Agreement" was defined to mean "any contract, whether written or oral, express or implied."  Atkinson Dec., Ex. 6 (Pl. Set One RFPs), Def., ¶ 1.

[3] While Hill served each Defendant with a set of his first and second RFPs, each set includes the same RFPs at the same number.  Plaintiff attaches here the MGM sets (Atkinson Dec., Exs. 6 & 8) and MGM responses (Atkinson Dec., Exs. 7 & 9) as representative.

agreements for released films and 10 agreements for unreleased properties—by searching for these agreements in alphabetical order by title until 10 agreements in each set have been located." Atkinson Dec., Ex. 10 (Apr. 16 IDC Email) at 3.

- Plaintiff's Last IDC Compromise: "Plaintiff proposes that for each bucket (released and non-released) the Studio Parties continue collecting agreements until they have collected 5 agreements for the period January 1, 1976 to December 31, 1977 and 5 agreements for the period January 1, 1978 to December 31, 1987, and that an agreement should only count if the agreement is: (1) for the purchase of all rights by UA or MGM in an already existing original unpublished screenplay; (2) a UA/MGM counterparty to the contract is a screenwriter's entity identified in the contract as granting rights in the screenplay to UA/MGM; (3) the contract identifies the natural person who wrote the screenplay; and (4) the subject screenplay is not identified in the contract as being based on another work." *Id.*

## III.   PLAINTIFF'S CONTENTION.

### A. Procedural Background:

Plaintiff served RFP No. 42 on August 5, 2024. On September 20, 2024, Defendants served objections. These objections did not agree to search for anything; rather, they constituted boilerplate relevancy and burden objections paired with vagueness and privilege objections. *See* Atkinson Dec., Ex. 7 (MGM's Set 1 RFP Responses). The Parties exchanged meet and confer letters. *See* Atkinson Dec., Exs. 11 at 7; 12 at 6; 13 at 4-5; 14 at 5-6; 15 at 5. On February 19, 2026, prior to the first IDC, Plaintiff served a Second RFP Set that included its RFP No. 63. RFP No. 63 is identical to RFP. No. 42, except that it seeks documents within the date range January 1, 1976 to December 31, 1977:

- 12 -

> Documents sufficient to evidence the standard and/or usual terms used by you in agreements concerning the acquisition of literary material from authors and/or their loan out entities from January 1, 1976 to December 31, 1977.

Atkinson Dec., Ex. 8 (Pl. Set Two RFPs).  On March 27, after the first two IDCs, but before the third, Defendants served their RFP. No. 63 response:

> [Defendants] object[] to this Request on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, not proportional to the needs of the case, and seeks documents irrelevant to the claims and defenses in this action.  The phrase "standard and/or usual terms" is vague and ambiguous, and presumes that any such policies or guidelines existed during the noted period.  [Defendants] object[] to this Request insofar as it seeks documents protected by the attorney-client privilege, work-product protection, or other applicable legal protections or privileges.  [¶] Subject to and without waiving the foregoing or the general objections, [Defendants] state[] that no responsive documents have been located after a reasonable search.

Atkinson Dec., Ex. 9 (MGM's Set 2 RFP Responses).

Plaintiff contends that RFP No. 63 is covered by this motion.  In the first IDC email Plaintiff noted RFP No. 63's service.  *See* Atkinson Dec., Ex. 16 (Mar. 5 IDC Email) at 10.  In the second, Plaintiff's compromise included a request for "1976" agreements and Plaintiff noted that "Plaintiff served a request … to capture pre-1976 Copyright termination provision effective date exemplars."  *See* Atkinson Dec., Ex. 17 (Mar. 24 IDC Email) at 7-8.  **The first key issue** is whether Defendants' search should cover just 1978 to 1987 (Defendants' contention) or 1976 to 1987, a two-year difference.

- 13 -

JT. DISC. STIP. RE PL. MTC RE RFP NO. 42

The Parties first discussed RFP No. 42 with the Court at the March 11 IDC.  In that IDC email Defendants did not offer to search for anything.  At the IDC, the Court indicated that it tentatively agreed with Plaintiff on relevance and ordered the Parties to continue to confer.  The Parties thereafter continued to meet and confer.  During a call, and as reflected in the second IDC email, Plaintiff proposed that:

> Defendants to search for and produce the first four "Agreements" Defendants find from each of the years: 1976, 1978, 1979, 1985, 1986, and 1987, with "Agreement" meaning a contract for the purchase of all rights by UA or MGM in an already existing original unpublished screenplay where: (1) a UA/MGM counterparty to the contract is a screenwriter's entity identified in the contract as granting rights in the screenplay to UA/MGM; (2) the contract identifies the natural person who wrote the screenplay; (3) the subject screenplay is not identified in the contract as being based on another work; and (4) the contract document is in the style of a formalized written contract.

Atkinson Dec., Ex 17 (Mar. 24 IDC Email) at 7.  Defendants rejected this proposal because Defendants maintain their files by project title not year.  *Id*.

At the second IDC, Defendants proposed that Plaintiff identify titles to search and that a random number generator be used to narrow the set further.  *See* Atkinson Dec., Ex. 18 (Mar. 26 IDC Tr.) at 33:2-6.  This was the first time Defendants provided a full explanation with respect to their title identification proposal.  *See id*. at 33:19-20.  At this IDC, Plaintiff explained that its proposal narrowed the RFP to focus on the most relevant agreement type.  *See id*. at 30:13-31:2 ("[W]e substantially narrowed the category of documents and came up with something that's quite specific and tailored, we believe …. We then sort

- 14 -

of defined specifically which we want to make it a contract that is very similar to the contract that we have at issue ….”).  Defendants disagreed, contending that Plaintiff's proposal was too tailored.  *See id*. at 32:12-16 (“[T]he specific parameters they've identified in the neutral statement 1 through 4 are substantively designed to get them a, quote-unquote, 'representative sample' that would bolster their case”).  This brings us to the **second key issue**: what sort of literary acquisition agreements are highly relevant here.  Plaintiff contends that if samples of each major category of acquisition agreements are not produced, then what should be produced are samples from the category that the agreement at issue in this case falls into: an agreement for the purchase of a pre-existing screenplay where the agreement includes the screenwriter's loan out entity as a counterparty.  Defendants contend that any sort of acquisition agreement will do.

At the second IDC, defense counsel offered to discuss the request with his clients further.  *See* Atkinson Dec., Ex. 18 (Mar. 26 IDC Tr.) at 36:7-14; 38:12-13.  The Court concluded that this dispute was not ripe, that further conferral was warranted, and noted that the Court “d[id] think that … what Mr. Atkinson is seeking is relevant.” *See id*. at 37:16-38:9.  The second IDC was held on March 26.  That same day the Court set a further IDC for April 21 (which was continued to April 22) and an April 16 due date for the Parties' third IDC email.  *See* Atkinson Dec., Ex. 19 (Mar. 26 Civil Minutes).

On April 13, the Parties had a meet and confer call to address the disputes that would be the subject of the third IDC.  Prior to this call, Defendants provided no update as to their client discussions on this dispute.  On the call, Defendants offered no update or proposal, instead sending Plaintiff their extant proposal on the afternoon of April 14, 19 days after Defendants first represented that they would discuss the issue further internally.  *Compare* Atkinson Dec., Ex. 20 at Apr. 13 at 11:07 pm *with id*. at Apr. 14 at 4:14 pm at bullet 2.

- 15 -

Defendants' new proposal was to search for acquisition agreements alphabetically, by title, until it found 10 agreements for released films for the period 1978-1987 and 10 agreements for unreleased projects for the same period. *See* Atkinson Dec., Ex. 20 at Apr. 14 at 4:14 pm at bullet 2. The Parties conferred on Defendants' proposal on April 15, *see* Atkinson Dec., Ex. 20 at Apr. 15 at 6:52 am ("confer briefly on … the IDC email we'll be exchanging today") & 7:40 am, and provided their respective proposals to the Court in their April 16 IDC email. *See* Atkinson Dec., Ex. 10 (Apr. 16 IDC Email) at 3.[4]

Defendants stood behind their April 14 proposal. Plaintiff provided a counter that built on what Defendants said they could do, search alphabetically, opposed to what Plaintiff had proposed prior, a search for agreements in 6 specific years. *Compare* Atkinson Dec., Ex. 10 (Apr. 16 IDC Email) at 3 *with* Ex. 17 (Mar. 24 IDC Email) at 7. Plaintiff altered Defendants proposal by: (1) asking that Defendants search until they collect 5 agreements for the period 1976 to 1977, and 5 agreements for the period 1978 to 1987, for each "bucket" (released v. unreleased titles); and (2) specifying a category of agreements that would count towards the 20-agreement total.

The Court held the third IDC on April 22. The Court's tentative was against this motion. The Court ordered the Parties to confer further and authorized briefing. *See* Atkinson Dec., Ex. 21 (Apr. 23 Civil Minutes). The Parties held their final call on May 7. The key points in contention remain: (1) what time periods should be covered; and (2) what agreements should count.

**B.  Relevancy:**

    **i.  The Discovery is Relevant to All Four Claims**.

---

[4] The Parties also conferred by phone as to this dispute prior to each of the other IDCs. *See* Atkinson Dec., Exs. 16 & 17 (Mar. 5 & 24 IDC Emails) at 1.

The 20 sample agreements Plaintiff seeks are relevant to each claim and counterclaim in this action.

Hill asserts two claims against Defendants, a claim for a declaration that his termination of Defendants' LPA acquired rights was valid and a claim that the 2024 Remake infringes.  *See* Atkinson Dec., Ex. 22 (Comp. Excerpt).  The issue of whether the Screenplay was a work-made-for-hire is central to both claims: did Hill write the Screenplay for Hill such that he could terminate Defendants' rights and then sue Defendants for infringement, or, as Defendants contend, was the Screenplay written for Hill's loan out entity, Lady Amos, such that the work-made-for-hire exception to termination applies.  *See* 17 U.S.C. § 203 ("In the case of any work other than a work made for hire ….").

Defendants contend that the LPA language that reads: "Owner represents … that … Property was created and written solely by Writer as an employee of Owner … Owner is the author of the Property (which constitutes a work-made-for-hire)" (the "Work-Made-For-Hire Clause"), Atkinson Dec., Ex. 4, ¶ 4(f), is evidence that the Screenplay was written for Lady Amos.  *See, e.g*., Atkinson Dec., Ex. 23 (Ans. Excerpt), ¶¶ 4 & 42.  If the Work-Made-For-Hire Clause frequently appears in Defendant historical agreements that are like the LPA, it negates Defendants' reliance on the clause, as it shows that the clause is not reflective of the actual circumstances surrounding a screenplay's creation.  The documents are relevant.

Defendants assert two counterclaims.  They contend that, as evidenced by the Work-Made-For-Hire Clause, Hill defrauded the Copyright Office by representing that he was the Screenplay's author (opposed to it being a work-made-for-hire for Lady Amos).  Alternatively, they contend that if the Screenplay is not a work-made-for-hire then Plaintiff breach the Work-Made-For-Hire Clause.  *See* Atkinson Dec., Ex. 23 (Ans. Excerpt), ¶¶ 50, 58 & 62.

- 17 -

For the reasons explained with respect to Plaintiff's claims, Defendants' agreements are relevant to Defendants' fraud claim.

As to the LPA breach claim, the sought agreements are even more relevant. While the reasons are multi-fold, Plaintiff highlights here its argument that the Work-Made-For-Hire Clause is unenforceable under Section 203's "an agreement to the contrary" provision. *See* 17 U.S.C. § 203(a)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary …."); *Ray Charles Foundation v. Robinson*, 919 F. Supp. 2d 1054, 1065-66 (C.D. Cal. 2013), rev'd on other grounds by 795 F.3d 1109 (9th Cir. 2015) ("[T]he Copyright Act prevents the Court from interpreting the agreements signed by Defendants as limiting their statutory termination rights …. [¶] The Foundation claims that the agreements cannot be considered 'agreement[s] to the contrary' … because those agreements do not expressly prevent Defendants from 'effect[ing]' the termination …they will just be liable to the Foundation … for breaching the agreements …. But forcing statutory heirs to choose between incurring a penalty for breaching an agreement or abandoning statutory termination rights is just a more creative way of preventing the exercise …."); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290-91 (2nd Cir. 2002) ("[A]n agreement made after a work's creation stipulating that the work was created as a work for hire constitutes an 'agreement to the contrary' which can be disavowed pursuant to the statute"); *cf. Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 315-16 (2d Cir. 2013) ("Cadence extended this same one-page, forward-looking form contract to all its freelance artists to ensure that commissioned work would be deemed a 'work made for hire' under the new 1976 Copyright Act ….[¶] [T]he Agreement appears to create an

- 18 -

'employee for hire' relationship, but the Agreement could not render Ghost Rider a 'work made for hire' *ex post facto* ….").[5]

If the Work-Made-For-Hire Clause routinely appears in Defendants' agreements to purchase pre-existing screenplays, it is evidence that the term is not included to reflect the true facts surrounding a screenplay's creation, but as a measure designed to ensure that screenplays are portrayed as works-made-for-hire at purchase—an unenforceable effort to take advantage of Section 203's work-made-for-hire exception.

### ii.  Defendants' Acquisition Agreements Are Not Equal.

The LPA is a long-form contract for the purchase of a screenplay, not a countersigned letter to purchase novel rights, and it is representative of but one category of the literary acquisition agreement types Defendants enter. Agreements that are similar in kind to it are relevant; those that are too different are not.

*Pre-Existing Screenplay Agreements:*

The LPA is for the purchase of a **pre-existing screenplay** that was not based on a prior work—it is not a mere agreement for the acquisition of rights to a screenplay that Defendants commissioned.  *See* Atkinson Dec., Ex. 4 (LPA), Preamble ("with respect to UA's purchase of all rights in the original unpublished screenplay entitled 'Roadhouse' ….") & Assignment, ¶ 1 ("to that certain original unpublished screenplay entitled 'ROADHOUSE', written by Lance Hill …").  While the original RFP No. 42 is broad enough to capture

---

[5] Section 304 is a Section 203 counterpart, and it too contains an "agreement to the contrary" provision.  *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 984-85 (9th Cir. 2008) ("The termination of transfer provision in § 203 … includes language identical to that provided in § 304(c): '[t]ermination of the grant may be effected notwithstanding any agreement to the contrary ….'"); *id.* ("[T]his close counterpart to § 304(c) ….").

documents evidencing the standard terms for agreements for the purchase of pre-existing screenplays *and* agreements for the acquisition of not yet written screenplays (e.g., a screenplay to be based on a novel or treatment Defendants already own the rights to), it is the former that is highly relevant to this action and it is that type of agreement that should count.

An agreement for a not yet existing screenplay does not speak to Defendants' retroactively recasting screenplays as works-made-for-hire in violation of Section 203's "notwithstanding any agreement to the contrary" provision for the simple reason that nothing yet existed to recast in the first place. Hence, even if every single not yet existing screenplay agreement contained a work-made-for-hire term, it would mean nothing to the issue of whether Defendants were engaged in the improper *retroactive* recasting of screenplays as works-made-for-hire notwithstanding the true circumstances surrounding their *pre-acquisition* creation. Defendants understand this and this is exactly why they contend that any sort of acquisition deal will do.

*Studio, Writer, Writer Loan Out Agreements:*

As evident from the LPA's preamble, it implicates three persons: a studio (UA), a writer (Hill), and the screenwriter's loan out entity (Lady Amos):

> AGREEMENT … between UNITED ARTISTS PICTURES, INC. ("UA") and LADY AMOS LITERARY WORKS, LTD … ("Owner") with respect to UA's purchase of all rights in the original unpublished screenplay entitled "Roadhouse" ("Property") written by Lance Hill (a/k/a David Leee Henry) ("Writer").

Atkinson Dec., Ex. 4 (LPA). Agreements that implicate this three-person structure—opposed to an agreement with just a Defendant and a writer (and no

- 20 -

loan out entity)—are the type of agreements most relevant here.[6]  What Defendants do in situations like this LPA speaks best to Defendants' intentions and motives surrounding this LPA's work-made-for-hire term.

While it is possible Defendants recharacterized pre-existing screenplays as works-made-for-hire through agreements that just involved a studio and a writer, it is less clear that they would have done so, as doing so would be especially brazen.  In an agreement just between a studio and a writer, the studio would have to, through the agreement, recharacterize the pre-existing screenplay as being created, pre-agreement, as *its* work-made-for-hire—a much more transparent bid to deprive writers of their statutory termination rights.  In contrast, in a three-person agreement the studio can point to the writer's pre-agreement loan out entity to recharacterize the pre-existing screenplay as a work-made-for-hire for the loan out.  Given this distinction impacts Defendants' motivations and the limited number of requested agreements (20), the set should be limited to agreements with a three-person structure.

The original request is admittedly broad and seeks representatives for agreement types Plaintiff can do without.  Plaintiff's targeted proposal narrows the request to get at the category of agreements that are especially relevant.  *Cf. Copeland Corp. v. Choice Fabricators, Inc*., No. 3:04CV398, 2007 WL 9717680, at *2 (S.D. Ohio Apr. 6, 2007) ("A party's business transactions with third parties in **similar circumstances** may be relevant to prove the probable terms or meaning of terms of a disputed agreement.  Contracts of a party with third persons may show a customary practice and course of dealing and be highly probative on the terms of the present agreement") (emphasis added).

---

[6] The original request encompasses representative agreements sufficient to show the standard terms for both agreement types: "[d]ocuments sufficient to show the standard … from authors and/or their loan out companies."

- 21 -

### iii.  There Are Two Relevant Time Periods.

Agreements from the 1976 to 1977 and 1978 to 1987 periods are relevant, given what may be shown by comparing the two eras.  The statutory termination right Plaintiff used went into effect in 1978.  *See Classic Media*, 532 F.3d at 983 ("[T]he 1976 Copyright Act, which took effect on January 1, 1978").  If the majority of pre-1978 agreements do not contain the Work-Made-For-Hire Clause, while most post-agreements do, it would evidence Defendants' standardization of the term in response to the newly effective termination right and its work-made-for-hire exception.

### C. <u>Burden and Proportionality:</u>

Defendants' original burden objections are boilerplate and should be overruled.  *See Vanguard Logistics v. Robinson*, No. CV 20-9880 JAK (PVCx), 2024 WL 1171654, at *7 (C.D. Cal. Mar. 6, 2024).  Moreover, Defendants have the burden to prove undue burden with specificity.  *See id.* at *3; *Shaw v. Experian Info. Solutions, Inc.*, 306 F.R.D. 293, 301 (S.D. Cal. 2015).  At the time Plaintiff provided its Joint Statement portion to Defendants, Defendants had not articulated their burden with any specificity.  Further, the analysis is not just about burden, it is about proportionality.  *See* Fed. R. Civ. P. 26(b)(1).

The requested documents are relevant.  That relevance is widespread.  Defendants are well resourced.  And the 2024 Remake, the big budget film Defendants say is not infringing because the Screenplay was a work-made-for-hire, was a huge success.  *See* Atkinson Dec., Ex. 24 (Amazon article) ("[T]he Amazon MGM Studios film[, Road House,] attracted more than 50 million worldwide viewers on Prime Video, breaking records as the studio's most-watched produced film debut ever worldwide"); Ex. 25 (Variety Article) ("Make the film for $60 million and get a theatrical release or take $85 million and go

- 22 -

streaming …. [¶¶] 'Road House' had attracted 80 million global viewers ….”). On balance, the scale weighs in favor of the sought discovery.[7]

Finally, Plaintiff offers a modified proposal that will likely reduce the burden placed on Defendants further:

- Defendants will search for 20 agreements that meet the below described criteria in alphabetical order by title.

- Defendants will continue searching until they have found:
    o 10 agreements from January 1, 1970 to December 31, 1977; and
    o 10 agreements from January 1, 1978 to December 31, 1996.

- An agreement counts if it: (1) is a long-form contract; (2) based on its preamble is for the purchase of rights by UA or MGM in an already existing screenplay; (3) based on its preamble it involves UA/MGM, a writer, and an entity that is not affiliated with UA/MGM; and (4) the preamble does not identify the pre-existing screenplay as based on another work.

- If Defendants maintain options to purchase screenplays by title with their agreements to purchase screenplays, then an option agreement that fits the above criteria will count.

This proposal should significantly lower the burden.  Defendants will only have to review an agreement's preamble to decide whether to collect the agreement or move on.  The expanded date ranges should make it more likely that a title pulled alphabetically contains an agreement that falls within the date range. And, if given how Defendants documents are maintained they will be sorting

---

[7] Nor is this a fishing expedition.  Plaintiff knows that the LPA was written using standard Defendant terms.  *Compare* Atkinson Dec., Ex. 26 (1986 UA Memo) at SP00000851 (“Except as provided above…UA's customary provisions should apply”) *with id.*, ¶¶1-11 (not describing a work-made-for-hire representation as a clause).

options from purchases, then permitting options to count should also result in Defendants collecting 20 agreements at a faster pace.

## IV. STUDIO PARTIES' POSITION

### A. The Cherry-Picked Set of Non-Party Agreements the Hill Parties Seek Would Bear No Relevance to Any Claims or Issues in this Action.

The Hill Parties' original RFP No. 42—the basis for this dispute—sought documents evidencing the "standard and/or usual terms … in agreements concerning the acquisition of literary material from authors or their loan out companies from January 1, 1978 to December 31, 1987." Upon the Studio Parties' confirmation that no such documents exist in the form of policies, guidelines, templates or otherwise, the Hill Parties pressed for the production of an "exemplary" set of agreements that would show the existence of any "standard and/or usual terms … in agreements concerning the acquisition of literary material from authors or their loan out companies from January 1, 1978 to December 31, 1987."

Despite the Studio Parties' position that non-party agreements are entirely irrelevant to whether the 1986 LPA itself was a contract of adhesion as the Hill Parties claim, *this is exactly what the Studio Parties have agreed to search for and provide*. Still unsatisfied, the Hill Parties now propose that an agreement "counts" only if it falls within the same category of acquisition agreement in which they have narrowly cabined the 1986 LPA at issue here. The apparent aim is to show the fact-finder that every non-party agreement the Studio Parties have produced looks just like the 1986 LPA so it must have been a "contract of adhesion."

The opposite is true of course—a cherry-picked selection of agreements that must look like the 1986 LPA on all fours is anything but "exemplary" of any "standard and/or usual" contract terms or practices employed by UA during the relevant time period in acquiring third-party properties. Nor would such a cherry-

- 24 -

picked set be probative of the Hill Parties' theory that UA forced Hill to use his loan-out company (formed 10 years earlier) to sell the 1986 Screenplay, precisely because the use of a loan-out entity is now a mandatory criteria for an agreement to "count" within the set of agreements the Hill Parties demand.

The *only* justification the Hill Parties offer for their narrowly selected criteria is that "[a] search across all acquisition agreements would sweep in materials of little to no relevance" like "a writing services agreement to write a commissioned screenplay" (*supra* at 7), because "[a]n agreement for a not yet existing screenplay does not speak to Defendants' retroactively recasting screenplays as works-made-for-hire in violation of Section 203's 'notwithstanding any agreement to the contrary' provision for the simple reason that nothing yet existed to recast in the first place" (*supra* at 19).[8]  But a writing services agreement for a work to be made in the future is not an acquisition or purchase of a literary property, but simply an agreement for the provision of future writing services.  In all events, such agreements would not be among the categories of agreements the Studio Parties have agreed to search for and produce, all of which will, as the Hill Parties demand, be for the purchase of *preexisting* literary properties for the potential development of film projects.

Nor do the Hill Parties offer any legitimate basis for their after-the-fact demand to expand the date range they originally proposed.  The Copyright Act and its termination provisions went into effect on January 1, 1978.  The 1986 LPA

---

[8] None of these non-party agreements would be admissible in any event to show what the Hill Parties speculate they might. As the Hill Parties themselves explain, their supposition that an agreement similar to the LPA would reflect the Studio Parties' alleged practice of retroactively recharacterizing literary properties as works-made-for-hire would turn on the precise circumstances surrounding the creation of each such work, none of which are at issue and subject to discovery in this action.

- 25 -

at issue was executed in 1986. And the Studio Parties have agreed to locate and produce acquisition agreements in the original date range from 1978-1987—the period in which the 1986 LPA was signed *and* the governing statutory regime was in place. Any purported propensities, practices and/or customs the Hill Parties (wrongly) speculate might have been borne of this statutory regime would be reflected in the agreements made during this period.

### B.    The Hill Parties Offer No Justification for the Disproportionate Burden They Seek to Impose.

Against the backdrop of their complete irrelevance, the burden for the Studios Parties to obtain the precisely defined universe of agreements picked to be helpful to the Hill Parties' case would be immense, and require the review of the files on an untold number of projects, and a review of an untold number of agreements, until the demanded number of agreements were located that fit the their exacting criteria. This burden is not justified by the irrelevance of any third-party agreements on the issue of whether the Hill Parties breached the representations and warranties in the agreement *they* signed in 1986.

The Hill Parties offer no justification to seek to impose this burden beyond their demand—with which the Studio Parties have agreed to comply—that only agreements for the purchase of preexisting works would be relevant to their "contract of adhesion" theory. Nor is there any evidence to otherwise support the fishing expedition the Hill Parties seek to undertake based on this concocted theory. Indeed, it is undisputed that the Hill Parties were represented by CAA, one of the most powerful talent agencies in the world. *See, e.g., Carbajal v. HSBC Bank U.S.A., N.A.*, No. CV 16-9297 PSG FFM, 2017 WL 7806587, at *3 (C.D. Cal. Sept. 1, 2017) (no procedural unconscionability "given that Plaintiff was represented by an agent at the sale [among other reasons]."). And far from being any "contract of adhesion," CAA and UA actively negotiated the terms of the

- 26 -

1986 LPA through various drafts, a process during which CAA provided UA with an extensively marked-up and revised version of the agreement with a checkmark manifesting assent for the same representation and warranty the Hill Parties claim was one of "adhesion."  Declaration of Wook Hwang ("Hwang Decl.") ¶ 2, Ex. A.[9]

DATED: May 8, 2026                    Respectfully Submitted,

                                      TOBEROFF & ASSOCIATES, P.C.

                                      By: */s/ Darrell R. Atkinson*
                                            Marc Toberoff
                                            Darrell R. Atkinson

                                      *Attorneys for Plaintiff and Counterclaim Defendant Hill and Third-Party Counterclaim Defendant Lady Amos*


                                      SHEPPARD, MULLIN, RICHTER & MULLIN LLP

                                      By: */s/ Wook Hwang*
                                            Wook Hwang
                                            Dylan J. Price
                                            Paul A. Bost

                                      Attorneys for Defendants
                                      METRO-GOLDWYN-MAYER STUDIOS

---

[9] *See, e.g., Siert v. Spiffy Franchising, LLC*, 758 F. Supp. 3d 1142, 1151 (N.D. Cal. 2024) (agreement not unconscionable where "Plaintiffs had over two weeks to review the Franchise Agreement, including the Arbitration Clause, during which time their legal counsel reviewed, redlined, and commented on many of the terms"); *Andreoli v. Youngevity Int'l, Inc.*, No. 3:16-cv-2922-BTM-JLB, 2021 WL 4933395, at *2 (S.D. Cal. Mar. 22, 2021) (same, where plaintiff "was represented by counsel and the Contract was the product of arms-length negotiation and multiple drafts").

- 27 -

INC., AMAZON STUDIOS LLC & UNITED ARTISTS PICTURES INC.

## SIGNATURE AUTHORIZATION ATTESTATION

I, Darrell R. Atkinson, attest that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content as to their respective portions, and have authorized the filing.

Dated: May 8, 2026                              */s/ Darrell R. Atkinson*
                                                Darrell R. Atkinson

JT. DISC. STIP. RE PL. MTC RE RFP NO. 42